# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NORMAN JACKSON, | Civil Action No. 17-1327 (SDW) |
| Petitioner, | |
| v. | OPINION |
| PATRICK A. NOGAN, et al., | |
| Respondents. | |

**WIGENTON**, District Judge:

Presently before the Court is the petition for a writ of habeas corpus of Norman Jackson ("Petitioner") brought pursuant to 28 U.S.C. § 2254 challenging Petitioner's state court conviction (ECF No. 1). Following this Court's Order to Answer, the State filed a response to the petition (ECF Nos. 5-7), to which Petitioner has replied (ECF No. 9). For the following reasons, this Court will deny the petition and deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction and sentence, the New Jersey Supreme Court provided the following summary of the factual basis of this matter:

> At about 8:30 p.m. on January 14, 2005, [Murul] Chowdhury was driving his taxi through Paterson to pick up a customer.[1] He stopped at a light on River Street, and noticed [Petitioner] walking near the taxi. Without warning, [Petitioner] entered the taxi through the right front door, sat in the passenger seat, and requested a ride to Broadway, one of Paterson's major roads, several blocks south of the taxi's location. Chowdhury, citing his customer waiting for him,

---

[1] The New Jersey Supreme Court noted that as Petitioner did not testify at trial, the only testimony as to these events provided at trial came from Chowdhury, the victim, and the officers involved in Petitioner's arrest. (Document 24 attached to ECF No. 5 at 5).

offered to take [Petitioner] to Broadway after picking up his customer, but [Petitioner] demanded twice more that he be driven to Broadway immediately. After the two men briefly argued, [Petitioner] pulled out a gun, cautioning Chowdhury to "look at this mother f****r." [Petitioner] pointed the gun at Chowdhury's chest, and the driver acceded to his passenger's demands and drove in the direction of Broadway:

> PROSECUTOR: When did you start driving? Was it before he pulled the gun ou[t], or after he pulled the gun out?
> CHOWDHURY: After.
> PROSECUTOR: Why did you start to drive?
> CHOWDHURY: Because he demanded we go to Broadway.

With his gun pointed at Chowdhury, [Petitioner] asked for money.[2] Chowdhury reached into his pocket and gave [Petitioner] sixty-five dollars, the fares he had collected that evening. [Petitioner] then demanded Chowdhury's wallet and Chowdhury complied:

> I give it to him, my wallet. He took the money. He give me my wallet back. Then he ask for it again, the wallet. Then he look [at] everything, give it to me back. Then he say, oh, f*** it. This wallet, I have my fingerprint in there. So I – from my breath and I like, wipe. Then he said, okay, put it in your pocket. Then I put it in my pocket.

Having taken the money, [Petitioner] then ordered Chowdhury to drive him through Paterson:

> Then he say, okay, start driving. Still driving, then he said, okay, take me to Broadway. And I driving in Straight Street and make a left in like Broadway Street and Straight Street. Then when I cross the like, [] Street, then he says, okay, pull up the car. Then I pull up. Then he say, okay. Don't drive, just park.

Chowdhury pulled the car over, and [Petitioner] left the car, instructing Chowdhury to drive away slowly. Based on the start and

---

[2] The Court also noted that it was not clear from the trial record whether the demand for money occurred before or after Chowdhury began driving towards Broadway. (Document 24 attached to ECF No. 5 at 6).

end locations testified to by Chowdhury, the total distance driven by Chowdhury with [Petitioner] in his taxi was .8 miles, representing approximately fifteen city blocks.

Almost immediately, Chowdhury flagged down a police officer, who requested backup. Chowdhury and the officer followed [Petitioner] into a park, where they were met by Officer Bizarro and other police officers, and the group found [Petitioner]. After a brief struggle, the officers handcuffed and arrested [Petitioner]. They conducted a pat-down search which revealed the money taken from Chowdhury, but no gun. The officers searched the park for the weapon, turning up nothing. At the scene of the arrest, Chowdhury identified [Petitioner] as the individual who had threatened and robbed him at gunpoint.

The officers then transported [Petitioner] to Paterson police headquarters, and Officer Bizzaro and another officer brought him to an interview room. Officer Bizzaro commenced a more thorough search of [Petitioner]. When the officer searched [Petitioner]'s groin area, [Petitioner] resisted the search, and the two punched on another and wrestled. Officer Bizzaro hit [Petitioner] with a metal police baton, and when a second officer entered the room, she assisted Officer Bizzaro in subduing [Petitioner]. With [Petitioner] handcuffed, the officers searched him and found in his underwear a "small caliber silver semi-automatic handgun" that was missing the slide that delivers bullets into the gun's chamber.[3] Following the search, [Petitioner] was transported to a hospital, where he received stitches for a cut above his left eye that he had sustained during his altercation with Officer Bizzaro.

Later that night, Officer Bizzaro prepared and filed a report of the incident that contained a material misstatement of the evening's events: it falsely stated that the officers found [Petitioner]'s weapon at the scene of his arrest. He later testified that he realized that his "negligence" in conducting an incomplete search at the scene of [Petitioner]'s arrest could have endangered officer's lives, and had resulted in the police transportation of a suspect carrying a gun, albeit a disabled gun. Noting that "there's no excuse," Officer Bizzaro testified that he "typed up the – the report stating that I found the weapon on the scene [of the arrest] when, in fact, I did not."

---

[3] As the Appellate Division noted on direct appeal, a "later search of [Petitioner]'s jacket uncovered the gun's slide." (Document 23 attached to ECF No. 5 at 1).

According to Officer Bizzaro, after he typed his false report, he noted that he had put his partner's "name on the bottom of a report that wasn't true." He testified that he prepared a second report later that night that made clear that [Petitioner]'s weapon was not recovered until after he and [Petitioner] had scuffled at police headquarters. According to his testimony, he left the first, false report on the desk in the Detective Bureau, and gave the second, correct report to his supervisor. He did not alert his superiors to the discrepancy between his two reports, but later testified that he assumed that his initial, false report regarding the recovery of [Petitioner]'s weapon had been destroyed because he "never turned it in." In fact, both reports remained on file as the State's case against [Petitioner] proceeded.

In April 2005, the Passaic County Prosecutor's Office presented the State's case to a grand jury. Called to testify before the grand jury, Officer Bizzaro was questioned by an assistant prosecutor who, he soon realized, had framed her questions based upon his first report containing false information. She asked Officer Bizzaro what he had recovered in his initial search of [Petitioner] in [the] Paterson park. Notwithstanding the fact that his initial search of [Petitioner] at the park had revealed only money, Officer Bizzaro testified falsely before the grand jury that he had found a weapon on [Petitioner] at the scene of his arrest in the park. Although he "realized [that the prosecutor] was asking me questions off the wrong report," Officer Bizzaro "made a bad judgment call and didn't correct it.

The grand jury returned an indictment, charging [Petitioner] with multiple offenses including first-degree robbery, [in violation of N.J. Stat. Ann. §] 2C:15-1, and second-degree kidnapping, [in violation of N.J. Stat. Ann. §] 2C:13-1(b)(1). However, the Passaic County Prosecutor's Office subsequently learned of Officer Bizzaro's initial fraudulent report and false grand jury testimony, and dismissed the indictment against [Petitioner]. The trial court ordered that all internal affairs reports and investigations be turned over to defense counsel. The Paterson Police Department administratively disciplined Officer Bizzaro for his conduct with a five-day suspension. [Petitioner] filed a civil suit against Officer Bizzaro for damages alleged to have been caused by the officer's altercation with [Petitioner] and his false testimony before the grand jury.

On January 2, 2007, a second grand jury returned a new indictment, including the same charges as the original indictment. In this second grand jury proceeding, Officer Bizzaro testified as to

the events recounted in his second, accurate report. [Petitioner] moved to dismiss the indictment, citing Officer Bizzaro's prior official misconduct and false grand jury testimony. He also sought the recusal of the Passaic County Prosecutor's Office, and moved to suppress the slide that had been a component of the gun found on [Petitioner] during the officer's second search. The trial judge denied [Petitioner]'s motions, but severed some of the charges set forth in the second indictment that did not relate to [Petitioner]'s encounter with Chowdhury.

. . . .

In August 2007, [Petitioner] was tried before a jury on seven counts of the second indictment: first-degree robbery, [in violation of N.J. Stat. Ann. §] 2C:15-1; fourth-degree aggravated assault with a firearm, [in violation of N.J. Stat. Ann. §] 2C:12-1(b)(4); second-degree possession of a weapon for an unlawful purpose, [in violation of N.J. Stat. Ann. §] 2C:39-4(a); third-degree unlawful possession of a weapon, [in violation of N.J. Stat. Ann. §] 2C:39-5(b); second-degree kidnapping, [in violation of N.J. Stat. Ann. §] 2C:13-1(b)(1) or (2); third-degree aggravated assault, [in violation of N.J. Stat. Ann. §] 2C:12-1(b)(5)(a); and third-degree resisting arrest, [in violation of N.J. Stat. Ann. §] 2C:29-2(a)(3).

During the five-day trial, the prosecution presented the testimony of Chowdhury, Officer Bizzaro and other current and former Paterson police officers. During the testimony of the State's witnesses, there were several references to extraneous proceedings – litigation filed by [Petitioner] and administrative discipline pertaining to [Petitioner]'s altercations with the officers and Officer Bizzaro's false grand jury testimony. The prosecutor alluded to those referenced during his summation, and [Petitioner] moved for a mistrial. The trial court denied the motion for a mistrial, but instructed the jury regarding the referenced in the testimony to extraneous legal proceedings. [Petitioner] declined to testify, and the defense rested without calling witnesses. [Petitioner] did not, at any time during the course of the trial, move for a judgment of acquittal.

On August 9, 2007, the jury convicted [Petitioner] of first-degree robbery, fourth-degree aggravated assault with a firearm, second-degree possession of a weapon for an unlawful purpose, third-degree unlawful possession of a weapon, second-degree kidnapping, third-degree aggravated assault of a law enforcement officer with no finding that the officer suffered bodily injury, and third-degree resisting arrest. The trial court then instructed the jury

on the offense of second-degree certain persons not to have weapons, [in violation of N.J. Stat. Ann. §] 2C:39-7, and the jury convicted [Petitioner] of that crime.

[Petitioner] moved for a new trial. After denying the motion, the trial court sentenced [Petitioner] to an extended term of thirty years' incarceration for the first-degree robbery charge with a period of eighty-five percent parole ineligibility and a five-year term of parole supervision under the No Early Release Act, [N.J. Stat. Ann. § 2C:43-7.2]. For the second-degree kidnapping charge, the trial court sentenced [Petitioner] to ten years in prison with an eighty-five percent period of parole ineligibility pursuant to NERA, with the sentence for the kidnapping offense to be served concurrently with [Petitioner]'s other prison terms. After merging the appropriate offenses into the first-degree robbery charge, the trial court sentenced [Petitioner] on the remaining counts to terms of incarceration to run concurrently with the thirty-year term imposed for the armed robbery.

[Petitioner] appealed his conviction, raising six claims of error by the trial court. An Appellate Division panel reversed [Petitioner]'s conviction on the kidnapping count, but otherwise affirmed his conviction.

(Document 24 attached to ECF No. 5 at 5-13.)

Petitioner thereafter petitioned for certification with the New Jersey Supreme Court, and the state cross-petitioned on the kidnapping issue. (*Id.* at 15). The New Jersey Supreme Court granted certification on two issues – whether Petitioner was properly convicted of kidnapping under New Jersey Law, and whether the trial court erred in denying Petitioner's motion for a mistrial based on alleged prosecutorial misconduct during summation. (*Id.*). On August 13, 2012, the New Jersey Supreme Court affirmed Petitioner's conviction in its entirety, and reinstated Petitioner's conviction for kidnapping as the record more than supported the conclusion that Petitioner had either subjected Chowdhury to "substantial confinement" and forced him to move Petitioner a "substantial distance" as required by the alternative prongs of the kidnapping statute. (*Id.*).

Petitioner thereafter filed a petition for post-conviction relief (PCR) in September 2012 asserting various claims of ineffective assistance of trial and appellate counsel. (*See* Document 26 attached to ECF No. 5). Following an evidentiary hearing solely addressing Petitioner's claim that counsel failed to convey his plea counteroffer to the State during plea negotiations, the PCR court denied that petition on March 14, 2014. (Document 22 attached to ECF No. 5). Petitioner appealed, and the Appellate Division affirmed the denial of post-conviction relief by way of a written opinion issued on June 6, 2016. (Document 25 attached to ECF No. 5). Petitioner petitioned for certification, but his petition was denied by the New Jersey Supreme Court on February 13, 2017. (Document 31 attached to ECF No. 5). Petitioner thereafter filed his current habeas petition. (ECF No. 1).

## II. DISCUSSION

### A. Legal Standard

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews*, --- U.S. ---, ---,132 S. Ct. 2148, 2151 (2012). Under the statute, as amended by the Anti-Terrorism and Effective Death Penalty Act, 28 U.S.C. § 2244 ("AEDPA"), district courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett*, 559 U.S. 766, 772-73 (2010).

Where a claim has been adjudicated on the merits by the state courts, the district court shall

not grant an application for a writ of habeas corpus unless the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly

expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States

Supreme Court. *See Woods v. Donald*, --- U.S. ---, ---, 125 S. Ct. 1372, 1376 (2015). "When

reviewing state criminal convictions on collateral review, federal judges are required to afford state

courts due respect by overturning their decisions only when there could be no reasonable dispute

that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual

determination of the state courts, "a determination of a factual issue made by a State court shall be

presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of

correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).


## B. Analysis

### 1. Petitioner's prosecutorial misconduct claim

In his first claim, Petitioner argues that he was denied Due Process when the trial court

denied his motion for a mistrial based on alleged prosecutorial misconduct during summation. The

duty of a prosecutor in a criminal proceeding is to see that justice is done rather than to secure

convictions, and as such prosecutors must "refrain from [the use of] improper methods calculated

to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935); *see also*

*United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016). While a prosecutor "may strike hard

blows [during his summation], he is not at liberty to strike foul ones." *Berger*, 295 U.S. at 88;

*Bailey*, 840 F.3d at 124. A criminal conviction, however, "is not to be lightly overturned on the

basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in

context; only by so doing can it be determined whether the prosecutor's conduct affected the

fairness of the trial." *United States v. Harris*, 471 F.3d 507, 512 (3d Cir. 2006) (quoting *United

States v. Young*, 470 U.S. 1, 11 (1985). Thus, a prosecutor's improper comments during

summation will only warrant habeas relief where those comments "so infected the trial with

unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*,

477 U.S. 168, 181 (1986); *see also Copenhefer v. Horn*, 696 F.3d 377, 392 n. 5 (3d Cir. 2012).

Whether an adequate curative instruction addressing any improper comments was given will be

relevant to that determination, as will the strength of the evidence against the accused. *Darden*,

477 U.S. at 182.

The New Jersey Supreme Court summarized the factual background for Petitioner's

contention as follows:

> Here, [Petitioner] alleges prosecutorial misconduct
> centering upon legal and administrative proceedings that arose from
> Officer Bizzaro's handling of the case, but were not relevant to the
> issues before the jury in [Petitioner]'s criminal case. In its cross-
> examination of the State's witnesses, the defense focused on Officer
> Bizzaro's misconduct. [Petitioner] suggested that police officers
> misidentified [Petitioner] as the perpetrator, that the police work was
> so flawed that it could not support a conviction, and that the officers
> planted the gun on [Petitioner].
>
> Three of the State's witnesses testified about civil and
> administrative proceedings that were extraneous to the criminal
> charges. First, Sergeant Angel Perales testified on the State's direct
> examination, without objection from [Petitioner], that [Petitioner]
> had filed a complaint against him alleging simple assault based on

the officer's alleged punching and kicking of [Petitioner], and that a court had noted "probable cause found" on [Petitioner]'s complaint.

Second, Officer Bizzaro testified about his altercation with and search of [Petitioner], in the Paterson Police Department interview room, and admitted to his false report and testimony before the first grand jury. After the prosecutor inquired about the Paterson Police Department's administrative proceedings against Officer Bizzaro, [Petitioner] made, and then withdrew, an objection premised on relevancy grounds. The prosecutor's questioning of Officer Bizzaro then shifted from the officer's administrative punishment to [Petitioner]'s civil action against him:

> PROSECUTOR: What was your punishment?
> OFFICER BIZZARO: Five days suspension.
> PROSECUTOR: And are you being sued?
> OFFICER BIZZARO: Yes.
> PROSECUTOR: By who?
> OFFICER BIZZARO: [Petitioner].
> PROSECUTOR: For what?
> OFFICERR BIZZARO: A million dollars.

Defense counsel did not renew his objection, and this testimony was admitted.

Finally, in testimony elicited by [Petitioner], not the State, Officer Bizzaro's partner, Officer Anne Marie Mattina, touched on civil litigation filed by [Petitioner]. Asked about her knowledge of injuries sustained by [Petitioner] in his struggle against the officers in the Paterson Police Department interview room, Officer Mattina disclaimed familiarity with those injuries, noting that she "did not receive a subpoena for – that I was getting sued from [Petitioner]." Defense counsel did not move to strike Officer Mattina's answer as unresponsive.

The challenged portion of the State's summation occurred near the close of the prosecutor's remarks. The prosecutor disputed [Petitioner]'s suggestion that Officer Bizzaro had planted the gun on [Petitioner], but commented that the officer "obviously chose the wrong path" when he lied about the officers' recovery of the gun, "not to plant something, not to frame an innocent, but not to get in trouble." He then ended his summation by citing the assault charge against Sergeant Perales, the administrative discipline upon Officer Bizzaro, and [Petitioner]'s civil litigation:

One day – you know, this case has another component to it that's not before you. Sergeant [Perales] was charged with simple assault. One day, he'll have to deal with that Complaint. Officer [Bizzaro] lost a week's pay. He earned that at least. He's also being sued for a million dollars. Now, that's another issue. Maybe some of you will feel he deserves to be bankrupted for the rest of his life for what he did. And maybe some of you won't.

He wanted – [Petitioner] wants somebody else's money that day. He was having a good day when he was able to get it, that $78. And then he had a bad day when Officer [Perales] was right there and when the other officers caught him as he got out of the cab. Then the day got better because Officer [Bizzaro] chose to lie in a report. And now he wants to be a millionaire. That's all for another day.

Your call here today is to say, "Are we okay with what he did? Are we okay with armed robbery?" And I hope you're not. Thank you.

Defense counsel promptly sought a mistrial or, in the alternative, a limiting instruction. He argued that the jury had been misled into concluding that by acquitting [Petitioner], he would be "rewarded and become a millionaire." The trial court denied the motion for a mistrial, noting that the evidence upon which the prosecutor had premised his comments had been admitted without objection, and that [Petitioner]'s credibility was not in issue because he did not testify. Ruling on [Petitioner]'s renewed motion for a mistrial the following day, the trial court commented that the prosecutor's statements had been prompted by the defense's understandable focus on "what could reasonably be argued as amateurish police work" in the case. However, the trial court agreed to give a limiting instruction, rejecting language proposed by the defense by charging the jury as follows:

Ladies and gentlemen, during the trial, you have heard testimony about other lawsuits, criminal and civil, related to this case. Those cases are separate from this case, of course. Each matter must be decided on its own individual merits. And the worth of the claims and allegations made in those other lawsuits will be the subject of separate proceedings in each of those matters. You must not consider that

> the verdict which you will return will in any way
> impact on any other case.
>
> The jury was thus informed that its verdict in the case before
> it was unrelated to the outcome of any civil litigation or
> administrative process involving the officers.

(Document 24 attached to ECF No. 5 at 20-24).

On direct appeal, both the Appellate Division and New Jersey Supreme Court found the remarks of the prosecutor to be improper, but ultimately concluded that they did not deny Petitioner a fair trial given the limiting instruction provided by the trial court, the fact that the comments in question arose directly out of evidence admitted into the trial record without a non-withdrawn objection, and the strength of the evidence against Petitioner. (*Id.* at 24-26). Having reviewed the record, this Court agrees. While the comments in question were improper, in making them the prosecutor himself noted that the issue of those extraneous matters was not before the jury. Likewise, the curative instruction given by the judge directly informed the jury that their verdict was entirely separate and non-determinative of any outside civil matters. Given the strong eyewitness testimony presented at trial from both police officers and Mr. Chowdhury and the direct and responsive curative instruction, this Court can only conclude that the prosecutor's remarks did not deny Petitioner a fair trial, and that they did not deny Petitioner his right to Due Process. *Darden*, 477 U.S. at 181-82. As such, the decision of the New Jersey Supreme Court to deny Petitioner relief as to this claim was neither contrary to nor an unreasonable application of federal law, nor did it involve an unreasonable reading of the facts of Petitioner's trial. Petitioner is therefore not entitled to habeas relief on this basis.

### 2. Petitioner's Kidnapping Claim

In his next claim, Petitioner asserts that his kidnapping conviction must be vacated because the state failed to prove that he either moved the victim a substantial distance or subjected him to substantial confinement. Petitioner essentially raises a claim that the evidence presented at trial was insufficient to support his conviction for kidnapping. When a petitioner presents a claim challenging the sufficiency of the evidence against him, "a reviewing court must ask 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Eley*, 712 F.3d at 847 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court may therefore overturn a conviction for insufficiency of the evidence only "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.* (quoting *Jackson*, 443 U.S. at 324). "Under *Jackson*, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove he offense is purely a matter of federal law." *Coleman v. Johnson*, 566 U.S. 650, 655 (2012). Under this "deferential federal standard," juries have "broad discretion in deciding what inferences to draw from the evidence presented at trial" and federal courts must not "unduly impinge[] on the jury's role as factfinder" by engaging in "fine-grained factual parsing." *Id.* So long as a rational fact finder could, given the benefit of all reasonable inferences and viewing the facts in the light most favorable to the State, find all of the essential elements of the crime in question beyond a reasonable doubt, a habeas claim based on the sufficiency of the evidence must fail.

Petitioner asserts that there was insufficient evidence to support his conviction for kidnapping insomuch as the evidence did not establish that he had subjected Chowdhury to either

substantial confinement or forced him to move a substantial distance. The New Jersey Supreme Court rejected that argument, explaining that the statute under which Petitioner was convicted required proof that Petitioner had either "removed the victim 'from his place of residence or business, or a substantial distance from the vicinity where he is found,' or 'unlawfully confine[d the victim] for a substantial period.' [N.J. Stat. Ann. §] 2C:13-1(b)." (Document 24 attached to ECF No. 24 at 28). The Court further explained that the "substantial distance" element requires only a showing that the victim was moved in such a way to isolate or expose him to an increased risk of harm, and is not dependent on the defendant moving the victim any particular minimum linear distance. (*Id.*). In essence, this element merely requires a showing that the victim, through movement, was exposed to risk over and above that of any underlying crime, such as the armed robbery involved in this matter. (*Id.* at 28-30). The New Jersey Supreme Court construed the substantial distance element similarly. That element requires confinement for a period of time "more than merely incidental to the underlying crime" which exposes the victim to an "enhanced risk of harm" resulting from the confinement and isolation imposed by the defendant. (*Id.* at 30-31).

Ultimately, the New Jersey Supreme Court found that the evidence produced at trial was more than sufficient to permit a rational fact finder to find either of the two alternative elements of a substantial distance or substantial confinement:

> Analyzing this case in conformance with our prior decisions, we hold that there was sufficient evidence to support the jury verdict with respect to both the "substantial distance" and "substantial confinement" elements of [N.J. Stat. Ann. §] 2C:13-1(b). [Petitioner]'s constraints on his victim went beyond the acts that were necessary to accomplish the armed robbery with which [Petitioner] was separately charged. [Petitioner] did not simply enter the taxi at the stoplight, brandish his weapon, demand and collect money from Chowdhury, and depart the scene, leaving Chowdhury in a position to promptly seek help. [Petitioner] isolated

Chowdhury, who was threatened with a gun and in a moving vehicle, thus impeding Chowdhury's ability to obtain assistance. Instead, he repeatedly ordered Chowdhury to drive him to a location blocks away.

[Petitioner] clearly exposed Chowdhury to an enhanced risk of harm. Because [Petitioner] remained in the taxi after the robbery was over and insisted that Chowdhury drive him to Broadway, he kept the victim in an isolated and vulnerable position. [Petitioner], brandishing a gun, forced Chowdhury to operate his taxi for several minutes, through city streets, exposing him to the risk of a serious accident, injury or death by virtue of a desperate attempt to escape, or the danger of a confrontation between [Petitioner] and law enforcement. The "linear distance" traveled was considerable, but the increased risk of harm imposed on this victim was greater still.

The same considerations support [Petitioner]'s conviction under the "substantial confinement" standard of [the statute]. The isolation and vulnerability experienced by the victim in this case was not coextensive with the armed robbery. As described at trial, [Petitioner]'s robbery of the victim – demands for cash and a wallet with which the victim immediately complied – consumed a short span of time. Yet, the victim's peril lasted significantly longer, as he was threatened with a gun and compelled to drive through the city of Paterson. He was thus exposed to a substantially extended confinement and a substantially increased risk.

Although the record does not disclose whether the jury premised its verdict on the kidnapping offense upon the "substantial distance [element] or the statute's "substantial confinement" element, or both, there was ample evidence supporting [Petitioner]'s conviction.

(*Id.* at 33-35).

Having reviewed the evidence provided at trial, this Court finds that the New Jersey Supreme Court involved neither an unreasonable application of federal law nor an unreasonable application of the facts. As explained, under New Jersey law, the central question as to either substantial distance or substantial confinement is the increased risk of harm imposed by the distance traveled or length of confinement. In this matter Petitioner confined Chowdhury for several minutes, forced him to drive nearly a mile through the city of Paterson, and did so under

the threat of attack with a gun, imposing upon Chowdhury a greatly increased risk of harm over that imposed merely by the armed robbery Petitioner also inflicted upon Chowdhury. Given the distance traveled, the increased risk of harm, and the length of time Chowdhury was confined and placed in danger by Petitioner, the evidence in the record is more than sufficient to permit a reasonable fact finder to conclude beyond a reasonable doubt that Petitioner both forced Chowdhury to move a substantial distance, and confined him by way of the threat of being shot for a considerable period of time, and the evidence was thus more than sufficient to support Petitioner's conviction for kidnapping. Petitioner's sufficiency of the evidence claim therefore fails and he is not entitled to relief on this basis.

### 3. Petitioner's Mistrial Claim

Petitioner next asserts that he was denied Due Process when the trial court refused to grant him a new trial based on his surprise when one of the police officers testified at trial that he recalled seeing Petitioner exit Chowdhury's cab on the day of the robbery shortly before Petitioner's arrest. Petitioner essentially seeks relief based on an alleged violation of state discovery rules. Absent certain specific circumstances such as *Brady* violation,[4] state discovery violations do not raise

---

[4] Petitioner did not originally raise a *Brady* claim in his habeas petition. (ECF No. 1 at 23-24). In his reply brief, however, Petitioner belatedly attempts to recharacterize his discovery violation claim as raising a *Brady* violation. Because this argument was raised for the first time in reply, this Court would be well within its discretion to decline to review Petitioner's *Brady* argument. *See Judge v. United States*, 119 F. Supp. 3d 270, 284 (D.N.J. 2015). That said, Petitioner's attempted *Brady* claim fails as the information he was not provided, that a police officer had seen him exit Chowdhury's cab shortly before the officer learned of the robbery, was not in any way exculpatory or favorable to his defense. Indeed, it was directly inculpatory to the extent it was in any way material. *See Kyles v. Whitley*, 514 U.S. 419, 432-34 (1995); *see also United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006) (*Brady* violation requires showing that the state suppressed material evidence which was favorable to the defense). Because the missing information was not favorable to Petitioner's defense, Petitioner cannot show that he would be entitled to relief under the *Brady* doctrine. *Risha*, 445 F.3d at 303.

federal constitutional issues sufficient to warrant habeas relief. *See, e.g., Perez v. Glover*, No. 10-655, 2012 WL 481122, at *20 (D.N.J. Feb. 14, 2012); *see also Marshall v. Hendricks*, 103 F. Supp. 2d 749, 777 (D.N.J. 2000), *aff'd in part and rev'd in part on other grounds*, 307 F.3d 36 (3d Cir. 2002), *cert. denied* 583 U.S. 911 (2003). State discovery rule violations will therefore only provide a basis for habeas relief where they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Marshall*, 103 F. Supp. 2d at 777 (quoting *Darden*, 477 U.S. at 181).

Following trial and before his sentencing, Petitioner moved before the trial court for a new trial, arguing that the State had failed to tell the defense that Officer Perales had seen Petitioner leave Chowdhury's cab moments before Chowdhury flagged him down and reported that Petitioner had robbed him. (*See* Document 19 attached to ECF No. 5 at 8-20). Petitioner's counsel argued that this amounted to a discovery violation warranting a new trial as Petitioner had not been informed that the officer could identify him as having left the cab before the robbery was reported to him. (*Id.*). Both during Perales's testimony and during argument on that issue, it was raised to the Court that Perales claimed to have filed a report containing his having seen Petitioner leave the cab, but that the report had been lost and had thus not been turned over to the Government. (*Id.*). Nothing in the record suggests that the loss of the report was anything other than inadvertent. (*Id.*). During argument, the State did present a copy of a detective's report that had been turned over to the Defense which clearly informed the Defense that Perales had told the detective that, while traveling East on Broadway, he had been stopped by Chowdhury, who immediately pointed out Petitioner as a man who had robbed him, at which point Petitioner fled and Perales gave chase, with the foot pursuit ending in Petitioner being captured by other officers who had heard Perales's request for help in apprehending Petitioner. (*Id.* at 14). The trial judge ultimately denied

Petitioner's motion for a new trial, finding that the evidence against Petitioner was overwhelming, that the documents which had been turned over to Petitioner "very easily fit" with Perales's trial testimony that he had seen Petitioner, and that Petitioner was not prejudiced by the lack of Perales's report as he had been provided information about what Perales was to testify to and had cross examined Perales extensively on the missing report.  (*Id.* at 14-20).

As to Petitioner's contention at that time that he might have pled guilty had he received the report, the trial judge made the following observations:

> . . . with regard to the argument that's presented here about [the] testimony of Officer [Perales] that was learned only at the time of trial, the argument is that [Petitioner] may have accepted the plea offer [if he had the report].  The State, recognizing that it had hurdles to overcome [due to Officer Bizzaro's actions], made a generous plea offer.  There is a record that is more than replete [with] discussions with [Petitioner] about how big a gamble he was taking, that he had the benefit of the State compromising enormously what they were suggesting before these problems came to light through the . . . defense attorney and [Petitioner], what they were asking for as a settlement of this case and how dramatically that proposition was dropped by the State in recognition of the fact that there was a police officer who wrote a false report and testified falsely before the grand jury.

> And [Petitioner] had that option.  That was available to him. He . . . rejected that option.  The [Petitioner] may believe . . . that he is innocent and, of course, I wouldn't have taken his plea if I had any sense of that in the first place.  And [Petitioner] has some civil litigation going where he is seeking . . . huge compensation from quite a number of individuals who are the subject matter of his civil rights actions and maybe felt that he was jeopardizing that and, if he got an acquittal, that [his civil case] would be that much more . . . fortified[.]  I really don't have much detail on that except that I know any number of lawyers have come to ask about the status of this case because they represent various Defendants who apparently are the subject of [Petitioner]'s . . . civil rights lawsuit.

> So, I have no reason to believe, even at this very moment, that there is any representation at all that [Petitioner]'s posture about going ahead with this trial would be different had he known about Detective [Perales's] testimony on the specific point of his seeing

[Petitioner] actually alight from the cab . . . as opposed to having seen him just immediately after he alighted from the cab because certainly that much was known.

(Document 19 attached to ECF No. 5 at 18-19). The New Jersey appellate courts likewise rejected this claim without further comment.

As noted by the trial court, Petitioner and counsel were clearly aware that Officer Perales was behind Chowdhury's cab around the time Petitioner left the cab, and that Chowdhury then flagged down Perales and specifically pointed out Petitioner as a man who robbed him before Perales and Chowdhury chased Petitioner through the park until he was apprehended by officers assisting them in the chase. That Perales may have seen Petitioner leave the cab, then, was no great leap from the information which was known to Petitioner prior to trial. In any event, it is clear that Petitioner was not denied a fair trial simply because he was not aware that Perales had seen him leave the cab. As noted by the trial court, Petitioner was able to use the lack of a report to cross-examine Perales, and Petitioner was already aware that Perales had been there when Chowdhury initially pointed Petitioner out as the robber. In light of the considerable other evidence in the record, including the remaining testimony of Chowdhury and Perales as well as the fact that Petitioner was found not only with a gun but also with the exact amount of money Chowdhury had reported stolen, as well as the fact that Chowdhury and Perales essentially followed after Petitioner from the time Chowdhury reported the robbery to the time of his capture, it is clear that Petitioner was not prejudiced by his not knowing that Perales had seen him exit Chowdhury's cab as well, and that the lack of this information did not render Petitioner's trial unfair. Likewise, this Court finds the determination of the trial court that there was nothing in the record to support the assertion that Petitioner may have accepted the plea offer had he known

Perales saw him leave the cab is neither an unreasonable application of federal law or the facts at hand.  Petitioner is therefore not entitled to habeas relief as to his discovery violation claim.

**4.  Petitioner's Ineffective Assistance of Counsel Claims**

In all of his remaining claims, Petitioner asserts that he suffered ineffective assistance of both trial and appellate counsel.  The standard applicable to such claims is well established:

> [c]laims of ineffective assistance are governed by the two-prong test set forth in the Supreme Court's opinion in *Strickland v. Washington*, 466 U.S. 668 (1984).  To make out such a claim under *Strickland*, a petitioner must first show that "counsel's performance was deficient.  This requires [the petitioner to show] that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687; *see also United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007).  To succeed on an ineffective assistance claim, a petitioner must also show that counsel's allegedly deficient performance prejudiced his defense such that the petitioner was "deprive[d] of a fair trial . . . whose result is reliable." *Strickland*, 466 U.S. at 687; *Shedrick*, 493 F.3d at 299.

> In evaluating whether counsel was deficient, the "proper standard for attorney performance is that of 'reasonably effective assistance.'" *Jacobs v. Horn*, 395 F.3d 92, 102 (3d Cir. 2005).  A petitioner asserting ineffective assistance must therefore show that counsel's representation "fell below an objective standard of reasonableness" under the circumstances. *Id.*  The reasonableness of counsel's representation must be determined based on the particular facts of a petitioner's case, viewed as of the time of the challenged conduct of counsel. *Id.*  In scrutinizing counsel's performance, courts "must be highly deferential . . . a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

> Even where a petitioner is able to show that counsel's representation was deficient, he must still affirmatively demonstrate that counsel's deficient performance prejudiced the petitioner's defense. *Id.* at 692-93.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693.  The petitioner must demonstrate that "there

is a reasonable probability, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Shedrick*, 493 F.3d at 299. Where a "petition contains no factual matter regarding *Strickland's* prejudice prong, and [only provides] . . . unadorned legal conclusion[s] . . . without supporting factual allegations," that petition is insufficient to warrant an evidentiary hearing, and the petitioner has not shown his entitlement to habeas relief. *See Palmer v. Hendricks*, 592 F.3d 386, 395 (3d Cir. 2010). "Because failure to satisfy either prong defeats an ineffective assistance claim, and because it is preferable to avoid passing judgment on counsel's performance when possible, [*Strickland*, 466 U.S. at 697-98]," courts should address the prejudice prong first where it is dispositive of a petitioner's claims. *United States v. Cross*, 308 F.3d 308, 315 (3d Cir. 2002).

*Judge v. United States*, 119 F. Supp. 3d 270, 280-81 (D.N.J. 2015).

### a. Petitioner's Plea-related Ineffective Assistance Claims

In his first ineffective assistance of counsel claim, Petitioner asserts that his trial counsel did not convey a counteroffer he made to the prosecutor requesting an eight year sentence as opposed to the ten years offered in the state's final and best plea offer. As the Third Circuit has explained,

The year after deciding Strickland, the Supreme Court slightly modified the prejudice prong of the Strickland test in connection with guilty pleas. *See Hill v. Lockhart*, [474 U.S. 52] (1985). . . . The Court has re-emphasized that "[d]efendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler v. Cooper*, --- U.S. ---, 132 S.Ct. 1376, 1384[] (2012).

When addressing a guilty plea, counsel is required to give a defendant enough information " 'to make a reasonably informed decision whether to accept a plea offer.'" *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) (quoting *United States v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)), *cert. denied*, --- U.S. ---, 134 S.Ct. 1340[] (2014). We have identified potential sentencing exposure as an important factor in the decisionmaking process, stating that "[k]nowledge of the comparative sentence exposure between standing trial and

accepting a plea offer will often be crucial to the decision whether to plead guilty." *Day*, 969 F.2d at 43.

*United States v. Bui*, 795 F.3d 363, 366-67 (3d Cir. 2015).

The PCR court held a hearing as to Petitioner's plea hearing claim. At that hearing, Petitioner's trial counsel testified that he conveyed any and all plea offers to Petitioner, that he did not recall Petitioner ever suggesting he make a counteroffer, and would have conveyed a counteroffer had he been asked to do so. (*See* Document 20 attached to ECF No. 5 at 40-42). In contrast, Petitioner testified that counsel refused to convey that counteroffer and instead told Petitioner that they should prepare for trial as they would win Petitioner's case. (*Id.* at 19-37). Petitioner also testified that, had that counteroffer been declined, he would have been willing to accept the State's last plea agreement. (*Id.*). Although Petitioner could have questioned counsel as to what advice he gave regarding the offered plea deals, he did not pursue any questioning as to counsel's advice.

The PCR court rejected Petitioner's claim, making the following findings:

> Now there is a credibility question here; and the credibility question centers around whether or not I believe [Petitioner]'s contention that he told [counsel] to go get [him an] eight [year plea offer] and [he'd] take it and [counsel] didn't do it; or is [counsel] telling the truth, that [Petitioner] never asked [him] to go get [an eight year sentence]; if he [had], [counsel testified he] would have done it.

> Well, there's two things I'll focus on. I'm not even getting into the fact that [counsel] is a 38 year officer of the court and an attorney at law versus [Petitioner] who has a significant criminal history.

> Who has the motive to lie here, that's really it. Why would [counsel, a public defender,] not convey a counteroffer to the Prosecutor? He's got nothing to gain by that. Doesn't make more money if this case goes to trial. If anything, it's more work for him. I'm sure given the choice of trying this case or giving the counteroffer to the State and working out a plea, [counsel] with one hundred percent certainty would have rather had the plea. And

22

there'd be no reason for him not to convey the counteroffer. He had no interest in this case going to trial. Arguably [Petitioner] did if he was trying to pursue a civil claim. But forgetting that now.

Let's look at [Petitioner]'s motive to say this now. Well, he's got a lot of reasons to say this now. If I bought into it, he'd be free, get a new trial. The State could never try this case again at this posture. So he's got nothing to lose and everything to gain by saying this.

[Counsel], on the other hand, has nothing to gain. And I find him to be more credible. When I sat here and asked him those questions and looked at him, I was more than satisfied from his tone, his body language and the way he answered me that he was telling the truth. And he has no reason not to tell the truth. Whereas, [Petitioner] has a strong motivation to say this now.

And I would also note I reviewed the whole record. [Petitioner] was not a defendant that sat there quiet and never addressed the Court. He repeatedly addressed the Court on his own.

If he wanted [an eight year deal] – and he knows the system. He's been through the system. If he didn't get word back from [counsel], on one of those occasions when he addressed [the trial judge] I'm absolutely certain he would have said Judge, I don't know if [counsel] conveyed this offer I want, but I'm going to do it now.

I don't believe for one second that [Petitioner] told [counsel] [to] get [him an eight year sentence] and [he'd] take [that plea deal] and [counsel] didn't convey that offer.

What I believe happened, [Petitioner] rejected [the ten year offer], did not make a counteroffer, went to trial, got convicted, got hit with a heavy sentence and now he's making this up to try to get out from under [his sentence]. That's what I believe. That's my ruling.

(Document 22 attached to ECF No. 5 at 11-13). The Appellate Division affirmed this ruling, finding that these credibility findings precluded Petitioner from receiving relief as Petitioner had not established ineffective assistance of counsel.

Giving proper deference to the PCR court's detailed credibility findings, and considering them in light of the trial court's observations during post-trial motions that the trial court and counsel had extensively discussed the offered deals with Petitioner, this Court concludes that Petitioner has failed to show that his counsel's performance was deficient. Per the PCR court's credibility findings, which this Court must presume to be correct as Petitioner has utterly failed to show by clear and convincing evidence that the PCR court was mistaken, *see* 28 U.S.C. § 2254(e)(1), Petitioner never requested a counteroffer be made, and counsel would have made such an offer had Petitioner asked. Instead, Petitioner rejected the State's plea offer and chose to proceed to trial. As the PCR court determined that Petitioner never made the counteroffer that forms the basis of this claim, and that counsel would have communicated a counter offer had it been made, the PCR court's rejection of Petitioner's first ineffective assistance claim was not contrary to or an unreasonable application of *Strickland* and *Hill*, and Petitioner is not entitled to habeas relief on that basis.

In his habeas petition, Petitioner also attempts to assert that his trial counsel was ineffective during plea negotiations as he did not explain to Petitioner the strengths and weaknesses of his case prior to Petitioner's rejection of the plea offer. As explained by the Appellate Division on appeal from the denial of Petitioner's PCR petition,

> In his PCR petition and before the PCR judge, [Petitioner] argued that his trial attorney was ineffective for failing to communicate a counteroffer to the State. In [his first PCR appeal claim, Petitioner] raises a different argument – that his trial attorney failed to communicate to him the strengths and weaknesses in the State's case and why the State's plea offer was reasonable. Plainly, the factual basis for this argument could have been explored at the evidentiary hearing. However, [Petitioner] did not raise this issue before the PCR judge. He may not do so for the first time on appeal. *State v. Arthur*, 184 N.J. 307, 327 (2005).

(Document 25 attached to ECF No. 5).  It is thus clear from the record that Petitioner procedurally defaulted his strengths and weaknesses claim, and was barred from proceeding on that claim pursuant to a clearly established state court procedural rule by the Appellate Division.  *Id.*

As the Third Circuit has explained,

> A federal court will ordinarily not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus "[o]ut of respect for finality, comity, and the orderly administration of justice." *Dretke v. Haley*, 541 U.S. 386[] (2004).  This is a reflection of the rule that "federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Id.* at [392-93]; *see Wainwright v. Sykes*, 433 U.S. 72, 81[] (1977).  The principal exception to this general rule precluding federal review of habeas claims that have been procedurally defaulted is for petitioners who can show "cause and prejudice" for the procedural default or that a "miscarriage of justice" will occur absent review. *Cristin v. Brennan*, 281 F.3d 404, 414 (3d Cir.2002).  An allegation of "actual innocence," if credible, is one such "miscarriage of justice" that enables courts to hear the merits of the habeas claims.

*Hubbard v. Pinchak*, 378 F.3d 333, 338 (3d Cir. 2004).  A showing of cause sufficient to escape the procedural default bar requires that the petitioner present "'some objective factor external to the defense impeded counsel's efforts' to raise the claim." *Parkin v. United States*, 565 F. App'x 149, 151-52 (3d Cir. 2014) (quoting *United States v. Pelullo*, 399 F.3d 197, 223 (3d Cir. 2005)).  Even where a petitioner can show cause, he is still required to demonstrate that he suffered actual prejudice insomuch as the alleged errors "worked to his actual and substantial disadvantage infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982).  Here, Petitioner has utterly failed to present cause for his procedural default of his claim, nor has he shown that he is actually innocent of the crime or will suffer a miscarriage of justice absent review of his claim.  He is therefore barred from proceeding on his second plea-related ineffective assistance of counsel claim. *Hubbard*, 378 F.3d at 338.

Even were this not the case, however, Petitioner's claim would still fail as he has not shown that he received deficient performance. Petitioner bases this claim entirely on one answer counsel provided at the evidentiary hearing. Specifically, during cross-examination, Petitioner's trial counsel said that Petitioner told him that the "State's supposed to make me a reasonable plea offer" and counsel responded by asking Petitioner "what is a reasonable offer[?]" (Document No. 20 attached to ECF No. 5 at 13). From this one statement, taken out of context, Petitioner asserts that counsel never discussed the strengths or weaknesses of his case nor advised him as to what was reasonable under the circumstances. Despite having ample opportunity to do so, though, Petitioner did not develop that claim in the slightest at his hearing.

This single out of context comment on which Petitioner bases his defaulted claim does not support Petitioner's assertion. Although counsel testified that he asked Petitioner what he thought was a reasonable plea offer, counsel did not testify that he did not advise Petitioner as to the plea, nor that he did not discuss with Petitioner his case. Instead, counsel's testimony was intended to show that Petitioner felt ten years was unreasonable. Counsel's testimony, which the PCR court found truthful and credible, further included a fact devastating to Petitioner's claim – that Petitioner insisted he was innocent and was not willing to plead guilty to the ten year offer. A further problem for Petitioner arises out of the fact that the record also includes a finding by the trial judge that Petitioner, his counsel, and the Court discussed how Petitioner was taking a big "gamble" by proceeding to trial and not pleading guilty in light of the evidence against him. (Document 19 attached to ECF No. 5 at 18-19). Thus, the only facts in the record on the claim Petitioner raises suggests that, contrary to Petitioner's unsupported assertions, that at least some discussion of the strengths and weaknesses of the case and the risk Petitioner was taking by not pleading guilty. Ultimately, because of Petitioner's failure to develop this claim at his PCR

hearing, Petitioner has failed in any way to show that he suffered either deficient performance or prejudice from counsel's advice as to the plea. Thus, Petitioner's second plea-related claim is both procedurally barred and is without merit and provides no basis for habeas relief.

**b. Petitioner's Identification-related and Cumulative Ineffective Assistance Claims**

In his next claim, Petitioner asserts that his trial attorney erred in failing to request a hearing pursuant to *United States v. Wade*, 388 U.S. 218 (1967), so that Petitioner could challenge Chowdhury's identification of Petitioner at the park following his arrest. In order to show that he was prejudiced by counsel's failure to seek a *Wade* hearing, Petitioner "must show that he would likely have prevailed on [his] suppression motion and that, having prevailed, there is a reasonable likelihood that he would not have been convicted." *Thomas v. Varner*, 428 F.3d 491, 502 (3d Cir. 2005). The standard governing the admissibility of an out of court identification was established by the Supreme Court in *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977). Under *Manson*, an identification procedure violates due process and the resulting identification is therefore inadmissible where the procedure used by the state was "unnecessarily suggestive and . . . create[d] a substantial risk of misidentification." *United States v. Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006); *see also United States v. Anthony*, 458 F. App'x 215, 218 (3d Cir. 2012). Although reliability is "the linchpin in determining the admissibility of identification testimony," *Manson*, 432 U.S. at 114, the question of whether an identification is reliable need only be addressed where the procedures used to procure that identification were themselves suggestive. *Id.* at 107-14; *see also State v. Henderson*, 208 N.J. 208, 219-220 (2011) (Under New Jersey law a *Wade* hearing need only be held where a criminal defendant "can show some evidence of suggestiveness").

Although Petitioner takes issue with the fact that Chowdhury was asked to identify him in the park at the time of his arrest, rather than via a formal lineup sometime thereafter, he provides little information which suggests that this identification procedure was in any way suggestive. The facts evinced at trial suggest instead that this impromptu identification procedure was merely the result of the facts of this case – Chowdhury hurried to flag down an officer shortly after the robbery, one of the officers involved had actually seen Petitioner leave the cab following the robbery, and both Chowdhury and the police followed Petitioner into the park, where he was detained and arrested. That Chowdhury then identified him was the result of the short time between the robbery and the arrest, and Chowdhury's presence at the scene of the arrest. Under the circumstances, this Court finds that Petitioner has failed to show that the procedures used were in any way suggestive, and as such Petitioner would not have been entitled to a *Wade* hearing even had he requested one.

Assuming Petitioner could show suggestive procedure, Chowdhury's testimony and the testimony of the officers at trial clearly established that the identifications in this case were reliable. Chowdhury was directly faced with Petitioner and his weapon during the dispute prior to the robbery regarding whether he would take Petitioner to Broadway and throughout the travel to Broadway as well as during the actual robbery. He had ample opportunity to view Petitioner, and the identification occurred shortly after Petitioner left the cab. Indeed, one of the officers himself testified to seeing Petitioner leave the cab and being able to identify Petitioner by the clothing he had been wearing at the time. Additionally, Petitioner was found to possess the exact amount of money Chowdhury had reported was stolen from him. Thus, both the testimony about the robbery and arrest as well as the surrounding facts strongly suggest that Chowdhury's identification of Petitioner was reliable. As such, the identifications were admissible regardless of any suggestive

procedure.  As a result, Petitioner has failed to show prejudice as any request for a *Wade* hearing would not have resulted in the identifications being suppressed, and counsel was therefore not ineffective in failing to seek the suppression of the identifications under *Wade*.  *Thomas*, 428 F.3d at 502.

Petitioner also asserts that trial counsel's alleged failures, both at the plea hearing and in not requesting a *Wade* hearing cumulatively denied him the effective assistance of counsel.  As Petitioner has failed to show that counsel's performance was deficient or that he was prejudiced in any way by counsel's actions, and as such his claims fail cumulatively for the same reason that they fail individually – Petitioner has utterly failed to establish ineffective assistance of counsel sufficient to warrant habeas relief.  He is therefore not entitled to habeas relief based upon the alleged ineffective assistance of trial counsel.  *Strickland*, 466 U.S. at 687-94.

### c.  Petitioner's Ineffective Assistance of Appellate Counsel Claim

In his final claim, Petitioner asserts that he also received ineffective assistance from his appellate counsel insomuch as counsel did not raise on appeal the *Wade* issue discussed above, the trial court's denial of Petitioner's motion to suppress the slide found in his jacket at the police station, or the denial of his motion to dismiss the second indictment based on Officer Bizzaro's lying during his first grand jury proceeding.  While the *Strickland* ineffective assistance standard applies to appellate counsel just as it does to trial counsel, *see Smith v. Robbins*, 528 U.S. 259, 285 (2000), "it is a well established principle . . . that counsel decides which issues to pursue on appeal," *Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996), and appellate counsel need not raise every nonfrivolous claim a defendant desires to pursue.  *Jones v. Barnes*, 463 U.S. 745, 751 (1983).  Because the heart of effective appellate advocacy is counsel's winnowing out weaker claims in

favor of those with a greater chance of success, *id.* at 753; *Smith v. Murray*, 477 U.S. 527, 536 (1986), the Supreme Court has held that "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *See Robbins*, 528 U.S. at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).

Petitioner has made no such showing. While Petitioner asserts that counsel should have raised the suppression of the gun slide, Petitioner provides little in the way of argument as to why the gun slide, found in a search after the gun-related scuffle with Officer Bizzaro, should have been suppressed. Petitioner likewise fails to fully explain why Bizzaro's deceptions, which were corrected before the second grand jury, required the dismissal of the second indictment against him. As explained above, the *Wade* claim Petitioner wishes counsel had raised was also without merit. In contrast to these vague and poorly defined claims, the claims counsel raised on Petitioner's behalf not only resulted in the Appellate Division finding in Petitioner's favor as to the kidnapping issue, but also resulted in the New Jersey Supreme Court taking Petitioner's case on both the kidnapping and prosecutorial misconduct claims. Thus, although Petitioner was ultimately unsuccessful before the New Jersey Supreme Court, it is clear that the claims counsel chose to raise were serious claims of sufficient merit to warrant a written opinion from the New Jersey Supreme Court, as well as a temporary grant of relief by the Appellate Division. Given the weak nature of the claims Petitioner asserts should have been raised and the clear (albeit not ultimately successful) strength of the claims counsel did raise on appeal, Petitioner has failed to show that counsel ignored claims stronger than those he did choose to raise, and Petitioner has thus failed to show that appellate counsel's performance was in any way deficient. *Robbins*, 528

U.S. at 288. Petitioner is therefore not entitled to relief on this claim, and the Appellate Division's rejection of this claim was neither an unreasonable application of federal law nor the facts at hand.

## III. CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. §2253(c), a petitioner may not appeal from a final order in a habeas proceeding where that petitioner's detention arises out of his state court conviction unless he has "made a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude that the issues presented here are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Because all of Petitioner's habeas claims are either without merit or are procedurally defaulted for the reasons set forth above, he has failed to make a substantial showing of a denial of a constitutional right, and the petition is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons stated above, Petitioner's petition for a writ of habeas corpus is DENIED and Petitioner is DENIED a certificate of appealability. An appropriate order follows.

Dated: November 27, 2017                    *s/ Susan D. Wigenton*
                                            Hon. Susan D. Wigenton,
                                            United States District Judge